FILED

SEP 2 3 2004

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| MOLECULAR DIAGNOSTICS LABORATORIES<br>3130 Highland Avenue, Suite 3315<br>Cincinnati, Ohio 45219-2374,<br><br>　　　　　　　　　　　　Plaintiff,<br>v.<br><br>HOFFMANN-LA ROCHE, INC., ROCHE MOLECULAR SYSTEMS, INC., PE CORPORATION, PE BIOSYSTEMS GROUP, THE PERKIN-ELMER CORPORATION, PE APPLIED BIOSYSTEMS, and APPLERA CORPORATION,<br><br>　　　　　　　　　　　　Defendants. | CIVIL ACTION NO.:_____<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>CASE NUMBER  1:04CV01649<br>JUDGE: Henry H. Kennedy<br>DECK TYPE: Antitrust<br>DATE STAMP: 09/23/2004<br><br>JURY ACTION |

Plaintiff, Molecular Diagnostics Laboratories, by and through their undersigned attorneys, hereby brings this action on behalf of itself and all others similarly situated for treble damages and injunctive relief under the United States antitrust laws against the above-named Defendants and demand a jury trial.

## NATURE OF THIS ACTION

1.　This case arises from Defendants' anticompetitive conduct related to *Thermus aquaticus* DNA polymerase ("*Taq*"). Defendants' conduct has occurred in and directly affected interstate commerce.

2.　The conduct of Defendants, as described herein, has injured Plaintiff and others similarly situated and has caused Plaintiff and others to pay more for *Taq* than they would have absent Defendants' conduct.

1

## JURISDICTION AND VENUE

3. Jurisdiction is conferred upon this Court by 15 U.S.C. §§ 15 and 22, and 28 U.S.C. §§ 1331 and 1337.

4. Venue is proper in this District under 15 U.S.C. §§15, 22, and 26 and 28 U.S.C. § 1391.

## PARTIES

5. Plaintiff Molecular Diagnostics Laboratories is an Ohio corporation, with a principal place of business in Cincinnati, Ohio. During the period of time covered by this Complaint, Molecular Diagnostics Laboratories purchased *Taq* directly from one or more of the named Defendants, their controlled subsidiaries or agents, or their co-conspirators. Plaintiff suffered injury in the United States as a result of Defendants' anticompetitive conduct alleged in this Complaint.

6. Defendant Hoffmann-La Roche, Inc. is a New Jersey corporation, with a principal place of business in Nutley, New Jersey. Hoffmann-La Roche, Inc. operates and sells products in each of the United States and the District of Columbia, including through subsidiaries and related companies, including Defendant Roche Molecular Systems, Inc. (collectively, "Roche"). Roche operates certain businesses, including the manufacture, sale, and distribution of diagnostic, pharmaceutical, and life-science research products.

7. Defendant Roche Molecular Systems, Inc. is a wholly owned subsidiary of Hoffmann-La Roche, Inc., organized and existing under the laws of the State of Delaware, with a principal place of business in Pleasanton, California and doing business in each of the United States and the District of Columbia.

8. Defendant PE Corporation (formerly known as The Perkin-Elmer Corporation) is a New York corporation with a principal place of business in Norwalk, Connecticut and doing business in each of the United States and the District of Columbia.

9. Defendant PE Corporation is the parent company of PE Biosystems Group. PE Biosystems Group is a business unit of PE Corporation. PE Applied Biosystems is a division of PE Biosystems. PE Biosystems Group and PE Applied Biosystems have their principal place of business in Foster City, California and do business in each of the United States and the District of Columbia.

10. Defendants PE Biosystems Group, PE Applied Biosystems, and PE Corporation are successors to or subsidiaries of The Perkin-Elmer Corporation with their principal places of business at Norwalk, Connecticut and Foster City, California, and each does business throughout the United States and the District of Columbia.

11. Defendant Applera Corporation is successor in whole or part to Defendants PE Biosystems Group, PE Applied Biosystems, PE Corporation, and/or The Perkin-Elmer Corporation. Applera, a Delaware corporation, has its headquarters and principal places of business in Norwalk, Connecticut and Foster City, California. It does business throughout the United States and the District of Columbia. (The PE entities described in ¶¶ 8-10, and Applera, are referred to collectively herein as "Applera.").

## *TAQ* DNA POLYMERASE AND THE POLYMERASE CHAIN REACTION ("PCR")

12. *Thermus aquaticus* is an organism that survives in high temperature environments. Scientists discovered this organism in the 1960s in the hot springs of Yellowstone National Park.

3

13. Because *Thermus aquaticus* will survive even when exposed to temperatures as high as 95° Celsius, it is described as "thermostable." This characteristic makes the organism useful to scientists working with a process known as "polymerase chain reaction," or "PCR."

14. The PCR process enables scientists and others, beginning with a small amount of DeoxyriboNucleic Acid ("DNA"), to generate many copies of, or to "amplify," minute quantities of DNA. Once the DNA has been copied through that amplification process, it can be studied or manipulated. The PCR process has led to advances in molecular biology and pathology and is used in the diagnosis and treatment of disease, including AIDS and other viral diseases, and in forensics.

15. In the PCR process, the DNA sample to be amplified undergoes rapid fluctuation between extreme heat and lower temperatures, a process known as "cycling." Machines that have been developed to automate this process are sometimes called "thermocyclers." In order to produce additional copies of the sample DNA, a substance known as DNA polymerase is also involved in the cycling process. A DNA polymerase, sometimes called a "reagent," is essentially an enzyme that acts as a catalyst for the formation of additional strands of DNA, using existing DNA as a template. In the early days of PCR, available reagents could not survive exposure to the heat extremes involved in cycling. The cycling process was cumbersome because a new DNA polymerase would have to be added at each cycle.

16. Scientists began working on isolating a thermostable DNA polymerase from *Thermus aquaticus* in the 1970s and some published their results in journal articles. In the mid-1980s, scientists at Cetus Corporation also worked on isolating thermostable DNA polymerase from *Thermus aquaticus*. (As noted above, the DNA polymerase isolated from the *Thermus aquaticus* organism will be referred to herein as "*Taq*.").

4

17. On December 26, 1989, the United States Patent & Trademark Office ("PTO") issued U.S. Patent No. 4,889,818 ("'818 patent") for DNA polymerase contained in *Thermus aquaticus* to Cetus. That patent was assigned by Cetus to Roche in 1991, as part of a transaction valued at approximately $300 million. By virtue of that transaction, Roche succeeded to all the rights and obligations of Cetus and became legally responsible for the acts and matters addressed in this Complaint prior to that date. Through numerous ventures and agreements, Applera has held and holds certain rights in the '818 patent.

18. Roche holds other patents covering PCR, including method Patents Nos. 4,683,195 ("the '195") and 4,683,202 ("the '202"). Applera holds certain rights, through numerous ventures and agreements, in these patents, as well as its own patents related to PCR.

19. The PCR business, including sales of *Taq*, has been extremely profitable for Roche and Applera.

### THE ROCHE-APPLERA PARTNERSHIP AND DEFENDANTS' ANTICOMPETITIVE CONDUCT

20. Roche and Applera have, for nearly two decades, maintained a partnership collectively and jointly to develop, market, and sell PCR-related products, including *Taq*.

21. That partnership extends back at least to 1985, when PE and Cetus entered into a joint venture known as Perkin-Elmer/Cetus Instruments ("PECI") to commercialize PCR products, including Cetus's DNA amplification technology.

22. Roche made substantial financial investments in Cetus in the late 1980s, including spending $6 million per year for five years to fund diagnostic research at Cetus. In 1989, Cetus and Roche began their joint development of diagnostic applications for PCR. In 1991, Roche purchased Cetus's PCR division and its ownership interest in PECI and assumed Cetus's position in the business partnership.

5

23. In and through their partnership, Roche and Applera have collectively and jointly manufactured, sold, and distributed *Taq* to Plaintiffs and others similarly situated, to the benefit of both Roche and Applera.

24. During the course of their PCR partnership, Roche and Applera have entered into numerous agreements and participated in meetings involving topics such as the development and management of intellectual property, patent prosecution, and the development, manufacture, distribution, licensing, and use of *Taq* and other PCR products.

25. The '818 Patent for *Taq* was obtained by misconduct through a series of material misstatements and omissions to the PTO, made with the intent to deceive the PTO.

26. This fraud on the PTO began on or about August 22, 1986 when Cetus filed an application for a patent which included a request for claims related to the DNA polymerase derived from *Thermus aquaticus*. While that application was later abandoned, a continuation in part was filed on June 17, 1987 as application 63,509 ("Application") for claims related solely to the natural DNA polymerase purified from *Thermus aquaticus* and to a recombinant form of that DNA polymerase.

27. Following the filing of the Application, the PTO undertook to review its contents. On October 27, 1988, the PTO rejected all of the claims of the Application as both "anticipated" under 35 U.S.C. § 102(b) and "obvious" under 35 U.S.C. § 103. The rejection was clear and unequivocal and pointed out that the DNA polymerase claimed had been previously disclosed and published throughout the world.

28. This rejection was a serious financial blow to Defendants, who had by then invested millions of dollars in the research and development of *Taq* and had jointly developed and begun to implement a business strategy around the sale of that enzyme.

29. Faced with the PTO's rejection of the *Taq* patent application, Defendants, through their employees and agents, prepared and submitted a letter to the PTO on March 6, 1989 (the "March Response") with the intent to defraud the PTO regarding the patentability of *Taq*. The Response sought to persuade the PTO to overturn its rejection of the Application by materially misrepresenting facts, omitting specific and important contrary data, misstating scientific principles, misrepresenting the content of prior art, and falsely reporting data.

30. In addition to the fraudulent scheme carried out by the March Response, Defendants had fraudulently submitted the original patent applications on August 22, 1986 and June 17, 1987. Defendants had never performed experiments listed in those applications, never obtained results stated in the applications, and then concealed their misrepresentations.

31. Applera and/or its predecessors knowingly aided and participated in Cetus's improper efforts to procure the '818 patent.

32. The PTO has no ability to check scientific conclusions, data, and reports and relies on applicants to be truthful in their representations. Unaware of Defendants' materially false statements, omissions, and fraudulent acts in seeking the '818 patent, the PTO relied on those statements, omissions, and acts, which caused it to issue the '818 patent in December of 1989.

33. Since the '818 patent was issued in December of 1989, Defendants have actively and consistently exercised and enforced their purported rights in the illicitly obtained '818 patent and enjoyed and exploited the market dominance that they improperly obtained through issuance of the patent.

34. Applera and/or its predecessors have maintained agreements with Roche, and entered into new agreements with Roche, to preserve, extend, and exercise power over the *Taq*

7

market, despite Applera's knowledge that the '818 patent was procured by fraudulent representations and omissions to the PTO.

35.  Applera and/or its predecessors have enjoyed and exploited the market dominance that was knowingly and improperly obtained through issuance of the patent.

36.  Since the '818 patent was issued in December 1989, Defendants have developed a variety of schemes and agreements to stifle competition and to injure and overcharge Plaintiff and others for PCR related products, including *Taq*.

37.  Among the methods for doing so, Defendants have threatened and filed legal actions asserting infringement of the '818 patent, despite being aware of the fraudulent conduct before the PTO that led to procurement of the patent and, hence, the fact that the patent was invalid.  For example, Roche, acting on behalf of itself and on behalf of Applera's predecessor PE, filed an action against Promega Corporation on October 27, 1992, in the United States District Court for the Northern District of California, alleging, among other things, infringement of the '818 Patent (the "Promega Litigation").

38.  In December of 1999, the District Court in the Promega Litigation concluded, after a bench trial, that intentional misstatements and omissions before the PTO had led to the issuance of the patent.

39.  Among the District Court's findings were that David Gelfand and Suzanne Stoffel, named inventors of *Taq* and later employees of Roche, with the assistance of corporate counsel, Kevin Kaster, falsely represented facts material to the PTO with the intent to deceive the PTO.

40.  On March 31, 2003, the United States Court of Appeals for the Federal Circuit affirmed all but two of the District Court's factual findings and remanded the case to the District

Court to assess whether the patent should be held unenforceable in light of the affirmed findings of material misrepresentations and omissions and evidence of intent to deceive.

41. On remand, in an order dated May 13, 2004 (the "May 2004 Order"), the District Court held that the '818 patent was unenforceable based on the findings of material misstatements and omissions to the PTO and the intent to deceive affirmed by the Federal Circuit.

42. More specifically, the District Court found that numerous misstatements were made during patent prosecution that, together and each of them individually, were material to the patent's issuance and were made with the intent to deceive the PTO. This intentionally deceptive conduct included:

  a. "making misleading statements regarding the relative fidelity of *Taq* as compared to the prior art enzymes";

  b. "claiming that *Taq* purified by the method taught in Example VI had a specific activity of 250,000 units/mg";

  c. "presenting Example VI as though it had been performed when, in fact, it had not been performed";

  d. "making deceptive, scientifically unwarranted comparisons between the specific activity of the claimed enzyme and the specific activity reported by Chien et al. and Kaledin et al.";

  e. "claiming that *Taq* purified according to the method taught in Example VI yielded a single 88 kd band of an SDS PAGE mini-gel"; and

  f. "claiming that the *Taq* produced was free from nuclease contamination."

43. After obtaining the '818 patent, Defendants repeated many of these same misrepresentations and omissions, by reference and directly, in order to deceive the PTO when prosecuting subsequent patents relating to *Taq* and PCR.

9

44.     Defendants' fraudulent procurement and enforcement of the '818 patent also inhibited, among other things, potential advances in molecular biology and pathology, and the treatment of life-threatening diseases, such as cancer, AIDS, and heart disease.

## CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action on behalf of itself and under Rule 23(b)(3) of the Federal Rules of Civil Procedure as representative of a class (the "Class") defined as:

> All persons or entities, other than the federal government, who paid compensation, including but not limited to, royalty and licensing payments, to Defendants for the purchase or use of *Taq* from the period of January 1, 1990 to the present.

46.     Members of the Class are numerous and joinder is impracticable. The Class members are identifiable from information and records in the possession of Defendants.

47.     Plaintiff's claims are typical of the members of the Class. Plaintiff and all members of the Class were injured by the same wrongful conduct by Defendants and suffered damages as a result. Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class.

48.     Plaintiff is represented by counsel experienced and competent in the prosecution of complex litigation, including class actions and antitrust litigation.

49.     Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members because, among other reasons, Defendants have acted on grounds generally applicable to the entire Class.

50.     Questions of law and fact common to the Class include:

    a.     Defendants' conduct in improperly obtaining the '818 patent;

    b.     Defendants' conduct in enforcing the '818 patent;

    c.     Defendants' conduct in exploiting the market dominance conferred by the '818 patent;

      d.      The nature of competitive alternatives that would have existed absent Defendants' anticompetitive conduct; and

      e.      The injury and damages sustained by purchasers of *Taq* as a result of Defendants' anticompetitive conduct.

51.    Class action treatment is the superior method for the fair and efficient adjudication of this controversy because, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh the difficulties, if any, that may arise in management of this class action.

### FRAUDULENT CONCEALMENT, ESTOPPEL AND TOLLING OF THE STATUTE OF LIMITATIONS

52.    Defendants' anticompetitive conduct has been undertaken in a manner designed to conceal Defendants' wrongdoing from disclosure. As a result, Plaintiff has, until recently, lacked information providing sufficient notice of Defendants' intentional misconduct. Although much of the information about Defendants' intentional misconduct remains concealed, the May 2004 decision of the United States District Court for the Northern District of California has, for the first time, provided Plaintiff and others similarly situated sufficient information to initiate these claims.

53.    Defendants' unlawful conduct before the PTO was based in fraud and Defendants have fraudulently concealed the existence of the anticompetitive behavior alleged herein. Defendants' fraudulent actions were self-concealing. Moreover, Defendants affirmatively concealed the existence of their unlawful conduct by, among other things, engaging in the

11

misrepresentations detailed in paragraph 41, and maintaining sham litigation based on a patent that Defendants knew was invalid.

54. Prior to May of 2004, even by exercising reasonable diligence, Plaintiff could not have discovered sufficient information to initiate these claims against Defendants and, despite its exercise of due and reasonable diligence, Plaintiff did not, in fact, discover information sufficient to initiate these claims before that date. Moreover, Defendants' improper efforts to enforce the '818 patent through litigation was only apparent once the district court rendered the May 2004 Order.

55. Defendants have also concealed the nature and substance of their exclusionary practices and agreements with each other by which they arranged jointly and collectively to exploit the market dominance facilitated by their improperly obtained patent.

56. As a result of Defendants' concealment, Plaintiff could not have filed this lawsuit sooner, and Defendants are, therefore, estopped from asserting the statute of limitations as a defense to any of Plaintiff's claims. Moreover, the statute of limitations in this matter was tolled due to Defendants' concealment.

## COUNT I

## MONOPOLIZATION
## 15 U.S.C. § 2

### (AGAINST ALL DEFENDANTS)

57. Plaintiff realleges and incorporates by reference paragraphs 1 through 56 as though fully stated herein.

58. The '818 patent was obtained through knowing and willful fraud and misrepresentations, including material misstatements and omissions to the PTO. Absent this knowing and willful fraud on the PTO, the '818 patent would not have been obtained.

12

59. By procuring the '818 patent through fraud, Roche and Applera achieved dominance in the market for *Taq* and have exercised their power in that market, which would have been subject to competition absent the fraudulent procurement of the patent.

60. In jointly and collectively exercising and enforcing their marker power and dominance, Roche and Applera have injured Plaintiff and other purchasers of *Taq*. Defendants' conduct includes, but is not limited to, threatening potential competitors and interfering with the ability of competitors to sell *Taq*.

61. The effect of Defendants' anticompetitive conduct was to cause antitrust injury to Plaintiff and other purchasers, including the payment of supra-competitive prices for *Taq* and PCR-related products.

## COUNT II

## **CONSPIRACY TO MONOPOLIZE**
## **15 U.S.C. § 2**

### (AGAINST ALL DEFENDANTS)

62. Plaintiff realleges and incorporates by reference paragraphs 1 through 61 as though fully stated herein.

63. In the course of their PCR partnership, Roche and Applera have, through numerous agreements related to the development, licensing, and use of *Taq* and other PCR products, patent prosecution, and enforcement of the '818 patent, acted in concert and/or conspired with the specific intent to dominate and monopolize the market for *Taq*.

64. Roche and Applera entered into such agreements and engaged in such conduct aware of the misstatements and omissions made in connection with the procurement of the '818 patent.

65.  The effect of Defendants' anticompetitive conduct was to cause antitrust injury to Plaintiff and other purchasers, including the payment of supra-competitive prices for *Taq* and PCR-related products.

## COUNT III

### RESTRAINT OF TRADE
### 15 U.S.C. § 1

### (AGAINST ALL DEFENDANTS)

66.  Plaintiff realleges and incorporates by reference paragraphs 1 through 65 as though fully stated herein.

67.  Roche and Applera have entered into and engaged in a combination and conspiracy to suppress competition for *Taq* and to exploit jointly the market dominance facilitated by the fraudulently procured '818 patent. Defendants also entered into numerous agreements involving joint decisions not to compete by price and otherwise, including market allocation agreements.

68.  Roche and Applera have also entered into and jointly enforced agreements which have resulted in the unlawful tying of separate PCR-related products.

69.  The agreements between Roche and Applera related to PCR and to *Taq* have restrained trade and injured both competition and consumers.

70.  The effect of Defendants' anticompetitive conduct was to cause antitrust injury to Plaintiff and other purchasers, including the payment of supra-competitive prices for *Taq* and PCR-related products.

14

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays:

A.  That this Court certify this case as a class action under Federal Rule of Civil Procedure 23;

B.  That this Court order that Defendants cease and desist from violating 15 U.S.C. § 1 and 15 U.S.C. § 2.

C.  That this Court enter judgment against Defendants, jointly and severally, in an amount equal to three times the amount of damages the Plaintiff class has sustained because of Defendants' actions;

D.  That Plaintiff be awarded all costs incurred, including reasonable attorneys' fees, as well as pre-judgment and post-judgment interest;

E.  That a trial by jury be held on all issues; and

F.  That the Plaintiff receive any other relief, at law and/or equity, the Court deems appropriate.

Dated this 23rd day of September, 2004.

Respectfully submitted,

*Michael D. Hausfeld /BAR*

Michael D. Hausfeld (D.C. Bar #153742)
Paul T. Gallagher (D.C. Bar #439701)
Brian A. Ratner (D.C. Bar #473284)
**Cohen, Milstein, Hausfeld**
 **& Toll, P.L.L.C.**
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC  20005
Tel:  202-408-4600
Fax:  202-408-4669

William A. Isaacson
Scott E. Gant
**Boies, Schiller & Flexner LLP**
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC  20015
Tel:  202-237-2727
Fax:  202-237-6131

Lynn L. Sarko
Mark A. Griffin
**Keller Rohrback L.L.P.**
1201 Third Avenue
32nd Floor
Seattle, WA  98101-3052
Tel:  206-623-1900
Fax:  206-623-3384

Linda P. Nussbaum
**Cohen, Milstein, Hausfeld**
 **& Toll, P.L.L.C.**
150 East 52nd Street, Thirtieth Floor
New York, NY  10022
Tel:  212-838-7797
Fax:  212-838-7745

Arthur N. Bailey
**Arthur N. Bailey & Associates**
111 West Second Street, Suite 4500
Jamestown, NY 14701
Tel:  716-664-2967
Fax:  716-664-2983

*Attorneys for Plaintiff Molecular Diagnostics Laboratories*