# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**MOLECULAR DIAGNOSTICS
LABORATORIES,**

           **Plaintiff,**

**v.**

**HOFFMANN-LA ROCHE INC., et al.,**

           **Defendants.**

</td>
<td>

**Civil Action No. 04-01649 (HHK)**

</td></tr>
</table>

## MEMORANDUM OPINION & ORDER

Molecular Diagnostics Laboratories ("MDL") brings this action against Hoffmann-La Roche, Inc., Roche Molecular Systems, Inc. (collectively, "Roche"), PE Corporation, PE Biosystems Group, the Perkin-Elmer Corporation, PE Applied Biosystems, and Applera Corporation (collectively, "Applera"), on behalf of itself and a class of all those similarly situated, alleging that Roche and Applera violated the Sherman Act, 15 U.S.C. §§ *et seq.* MDL claims that it was forced to pay an artificially inflated price for *Thermus aquaticus* DNA polymerase ("*Taq*") as a result of the enforcement by Applera and Roche of a patent allegedly obtained by fraud. Currently before the court are Roche's and Applera's motions to dismiss MDL's complaint. Upon consideration of the motions, the opposition thereto, and the record of this case, the court concludes that the motions must be denied.

## I.  BACKGROUND

*Taq* is a thermostable enzyme derived from *Thermus aquaticus* bacteria and an important component of a process known as "polymerase chain reaction" ("PCR"). PCR is a technique used to replicate DNA, allowing small DNA samples to yield larger quantities that

can then be studied or manipulated.  During the PCR process, a sample of DNA is subjected to

rapid fluctuations between extreme temperatures—*Taq* is able to withstand these volatile

temperature changes and still remain an effective catalyst for the replication of DNA.

*Thermus aquaticus* was discovered in the 1960s and, because it is able to survive in

high temperature environments, its potential application in the PCR process was quickly

recognized.  Cetus Corporation ("Cetus") was among the scientific teams that attempted to

isolate a thermostable polymerase from *Thermus aquaticus*.  As early as 1985, Cetus and the

Perkin-Elmer Corporation[1] entered into a joint venture called PECI, created "to commercialize

Cetus's DNA amplification technology."  Compl. ¶ 21. After a number of unsuccessful patent

applications, on December 26, 1989, the United States Patent & Trademark Office ("PTO")

issued Cetus U.S. Patent No. 4,889,818 ("'818 patent") for the DNA polymerase contained in

*Thermus aquaticus*.

In 1991 Cetus assigned the '818 patent to Roche as part of a transaction valued at

approximately $300 million.[2]  Compl. ¶ 17.  Roche also purchased Cetus's ownership interest

in PECI, thereby assuming Cetus's position in the partnership.  Compl. ¶ 22.  In addition,

various members of the Applera and Roche defendants subsequently entered into a distribution

agreement used to facilitate the production, sale, and distribution of *Taq*.

Both Roche and Applera currently remain active in the *Taq*-market.

---

[1]  Applera Corporation is the successor in whole or part to defendants PE Biosystems Group, PE Applied Biosystems, PE Corporation, and/or the Perkin-Elmer Corporation.

[2]  Roche holds other patents related to the PCR process, among them Patents Nos. 4,683,195 and 4,683,202.  Compl. ¶ 18.

MDL, a direct purchaser of *Taq*, alleges that the market dominance enjoyed by Roche and Applera results from a fraudulently obtained patent.  According to MDL, the application for the '818 patent "materially misrepresented[ed] facts, omitt[ed] specific and important contrary data, misstat[ed] scientific principles, mispresent[ed] the content of prior art, and falsely report[ed] data."  Compl. ¶ 29.

On September 23, 2004 MDL filed the instant action.  MDL claims that Applera and Roche, through the enforcement of the '818 patent and "a variety of schemes and agreements,"[3] have conspired to monopolize the market for *Taq*, and restrained trade to the detriment of competitors and consumers.  As a result of Applera's and Roche's allegedly anticompetitive behavior, MDL asserts that it has suffered antitrust injury by being forced to pay "supra-competitive prices for *Taq* and PCR-related products."  Compl. ¶ 61.

## II.  DISCUSSION

Applera and Roche each move to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) on a variety of grounds.  The court will address their arguments in turn.

### A.  Standing

A grant of a patent exempts the holder from the normal prohibition against monopolies. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("A patent . . . is an exception to the general rule against monopolies and to the right to access to a

---

[3] MDL claims that defendants stifled competition by, among other things, enforcing the '818 patent though affirmative litigation.  Specifically, MDL asserts that "Roche, acting on behalf of itself and on behalf of Applera's predecessor PE, filed an action against Promega Corporation on October 27, 1992, in the United States District Court for the Northern District of California, alleging . . . infringement of the '818 Patent" ("the *Promega* litigation")."  Compl. ¶ 37.

3

free and open market.") (quoting *Precision Instrument Mfg. Co. v. Auto. Maintenance Mach. Co.*, 324 U.S. 806, 816 (1945)).  This immunity from federal antitrust laws, however, is stripped away when a patent is procured by fraudulent conduct.

In *Walker Process*, the Supreme Court permitted plaintiffs to seek treble damages under the antitrust laws when the fraudulent procurement of a patent is coupled with a violation of section 2 of the Sherman Act.  *Id.* at 178.  Here, MDL maintains that Applera and Roche used the '818 patent, procured by fraud, to monopolize the market for *Taq*.  Because MDL is a direct consumer of *Taq*, MDL asserts that it has standing to prosecute a *Walker Process* claim as an injured party under the antitrust laws.  In response, both Applera and Roche argue that the *Walker Process* decision did not contemplate direct consumers as suitable plaintiffs in this type of action.  Rather, they contend, the only entity with standing to bring a *Walker Process* claim is a competitor or, more specifically, an entity against whom a fraudulently obtained patent is, or could be, enforced.[4]

Applera and Roche rely on *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522 (D.N.J. 2004), and *Carrot Components Corp. v. Thomas & Betts Corp.*, 229 U.S.P.Q. 61 (D.N.J. 1986), in support of the proposition that *Walker Process* claims are available exclusively to

---

[4]  Defendants are indeed correct that the vast majority of *Walker Process* claims are brought by parties against whom a patent is enforced.  *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1067 (Fed. Cir 1998) ("[A]n antitrust claim premised on stripping a patentee of its immunity from the antitrust laws is typically raised as a counterclaim by a defendant in a patent infringement suit.") (citing *Argus Chem. Corp. v. Fibre Glass-Evercoat Co.*, 812 F.2d 1381, 1383 (Fed. Cir. 1987)).  Indeed, with the exception of the two cases discussed *infra*, neither the parties nor the court have been able to identify an instance in which a customer litigated a *Walker Process* claim.

4

those against whom a patent is enforced.  The court finds that neither of these authorities is controlling, nor in this instance, persuasive.

*Carrot Components* is factually distinguishable.  Unlike here, the plaintiff in *Carrot Components* was not a customer of the defendant, but rather claimed to be a competitor.  The court dismissed the complaint because the plaintiff "failed to establish that defendant had sought to enforce the patent against plaintiff, or that plaintiff had some reasonable basis for fearing such attempted enforcement."  229 U.S.P.Q. at 64.  The ruling was limited to the facts of that case, and did not purport to establish a rule of general applicability.

The court in *In re Remeron*, by comparison, did find that a direct purchaser lacked standing to bring a *Walker Process* claim.  However, the court offered little justification for its holding, stating:

> Plaintiffs, as direct purchasers, neither produced mirtzapine nor would have done so; moreover, Plaintiffs were not party to the initial patent infringement suits.  Plaintiffs may not now claim standing to bring a *Walker Process* claim by donning the cloak of a Clayton Act monopolization claim.

335 F. Supp. 2d at 529.  The holding cites no controlling precedent, nor offers any compelling justification for its conclusion.

The inclusion of the fact that the plaintiffs were not parties in the initial patent infringement suits suggests that the court confused the harm addressed through a *Walker Process* claim.  The court appears to believe that, standing alone, the enforcement of the fraudulently procured patent is the relevant injury in a *Walker Process* claim, hence the court's assertion that a plaintiff must be an actual or potential competitor.  This, however, is not the case.  *Walker Process* claims are intended to address antitrust injury, thus the requirement that

a plaintiff be able to allege a violation of Section 2 of the Sherman Act.[5]  *See Walker Process*,

382 U.S. at 179 (holding that an action for treble-damages maybe maintained under § 4 of the

Clayton Act if "(1) the relevant patent is shown to have been procured by knowing and willful

fraud . . . *and* (2) all the elements otherwise necessary to establish a § 2 monopolization charge

are proved.") (emphasis added).  A *Walker Process* claim is not a fraud claim, as the court

intonates, but an antitrust violation.  The harm is not the invalid patent, but the use of the

invalid patent to establish a monopoly.[6]

 Viewed properly as an antitrust claim, there is little reason to think that standing

requirements for *Walker Process* claims differ from standing requirements in more

conventional antitrust actions.  *See Uniform Food Sys., Inc v. Swift-Eckrich, Inc.*, 375 F.3d

1341, 1362 (Fed. Cir. 2004) (holding that, with respect to the *Walker Process* standing inquiry,

"[o]nce we have determined . . . that a patentee deserves no antitrust immunity, our inquiry

shifts to apply the substantive antitrust laws . . . .).  As plaintiff notes, direct purchasers are

generally recognized as having standing to prosecute antitrust claims.  *See* 2 Phillip E. Areeda

---

[5]  Regardless of whether there is an antitrust violation, a party against whom a patent is being enforced is always free to raise, as a defense, that the patent was invalid as a result of "inequitable conduct."  *See Nobelpharma AB*, 141 F.3d at 1070 ("Inequitable conduct is thus an equitable defense in a patent infringement action and serves as a shield, while a more serious finding of fraud potentially exposes a patentee to antitrust liability and thus serves as a sword.").

[6]  The *In re Remeron* court's confusion is further evidenced by its acknowledgment that "[p]laintiffs . . . may bring antitrust claims on other grounds even though they are not direct competitors . . . ."  335 F. Supp. 2d at 529 (citing *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000) (finding class plaintiffs pharmaceutical purchasers could sue for antitrust violations)).  This statement evinces a belief that the Supreme Court created a new cause of action in *Walker Process*, which it did not.  It merely clarified the means by which a plaintiff could gain access to the protection of federal antitrust laws.

& Herbert Hovenkamp, Antitrust Law, ¶345 (2d ed. 2000) ("Because protecting consumers from monopoly prices is the central concern of antitrust, buyers have usually been preferred plaintiffs in private antitrust litigation.  As a result, consumer standing to recover for an overcharge paid directly to an illegal cartel or monopoly is seldom doubted."); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734–35 (1977) (recognizing that antitrust laws will be effectively enforced by "concentrating the full recovery for the overcharge in the direct purchasers . . ."). In the absence of a compelling reason to the contrary, the court is hesitant to restrict a direct purchaser's ability to sue for treble damages under § 4 of the Clayton Act.  *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476 (1982) ("[T]he unrestrictive language of [section 4], and the avowed breadth of the congressional purpose, cautions us not to cabin § 4 in ways that will defeat its broad remedial objective.").

     The court appreciates that a number of factors should be considered before adopting a broad rule with respect to standing.  Conferring standing upon every individual tangentially affected by an alleged antitrust violation presents the risk of duplicative recovery, and may subject defendants to an onslaught of litigation.  *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972); *Blue Shield*, 457 U.S. at 476–77 (1982).  Recognizing these dangers, courts are counseled to "examine other factors in addition to antitrust injury, such as the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is a proper plaintiff under § 4."  *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 n.6 (1986) (contrasting the standing considerations when plaintiff is seeking injunctive relief rather than treble damages).

Examining these factors, the court sees no reason to limit standing to competitors. While entities facing enforcement actions are more likely to rely on *Walker Process*, this reflects more that they are in a stronger position to detect wrongdoing than a Congressional preference.  If one believes that one of the primary purposes of a treble damages action is deterrence, then increasing the number of parties scrutinizing the actions of potential monopolists will further that goal.  Moreover, because direct purchasers have frequent interactions with the defendants, they have a strong incentive to discover and litigate the offense.  *See* William H. Page, *The Scope of Liability For Antitrust Violations*, 37 STAN. L. REV. 1445, 1488 (1985).  Those against whom a patent is enforced, by comparison, will generally have limited contact with a defendant unless there is the suspicion of infringement.

Nor is there any particular difficulty in determining damages for direct purchasers.  As the Supreme Court stated in *Illinois Brick*, direct purchasers are a preferred plaintiff, in part, for the ease of apportioning damages: "We conclude that the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws under § 4 is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it."  431 U.S. at 746 (citations omitted).

Based on the foregoing analysis, the court finds that direct purchasers have standing to pursue *Walker Process* claims.

**B. Statute of Limitations**

Having decided that MDL has standing to assert the antitrust claims raised in its complaint, the court must next turn to Applera's and Roche's arguments that these claims are barred by the statute of limitations.

It is well settled that the statute of limitations for antitrust actions is four years. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 183 (1997) (recognizing "the 4-year limitations period contained in § 4B of the Clayton Act (Antitrust), as added by 69 Stat. 283, and as amended, 15 U.S.C. § 15b—the statute of limitations that governs private civil antitrust actions seeking treble damages"). Applying this four-year statute of limitations and assuming the absence of tolling, because MDL's complaint was filed on September 23, 2004, if its claims accrued prior to September 23, 2000, they should be dismissed as untimely.

Defendants urge that, at the latest, MDL was on notice of the alleged fraud perpetrated against the PTO by December 7, 1999. On this date, the court in *Hoffman-La Roche, et al. v. Promega Corp.*, 1999 WL 1707330 (N.D. Cal. Dec. 7, 1999), *vacated and remanded*, 323 F.3d 1354 (Fed. Cir. 2003), issued a decision in which it found, *inter alia*, that the '818 patent had been procured by inequitable conduct.[7]

---

[7] Because the *Promega* litigation plays a central role in the court's statute of limitations analysis, a brief history of the case is provided. Following Roche's purchase of the '818 patent, Roche came to believe that Promega was violating a license agreement negotiated with Cetus, and assigned to Roche following the purchase of the '818 patent. *See Hoffman-La Roche Inc. v. Promega Corp.*, 33 U.S.P.Q. 2d 1641 (N.D. Cal. June 13, 1994). Roche initiated litigation against Promega in October of 1992. In response, in June 1994, Promega filed a counterclaim asserting that the '818 patent was unenforceable due to inequitable conduct that occurred during the patent application process. In 1996, after Promega was granted partial summary judgment, a trial was ordered to determine whether there was clear and convincing evidence of intent to deceive the PTO. *Hoffman-La Roche Inc. v. Promega Corp.*, No. 93-1748 (N.D. Cal. Aug. 9, 1996) at 65. On December 7, 1999, the court found that the '818 patent had been fraudulently

MDL does not contest that it first became aware of its claims via the *Promega* litigation. However, MDL asserts that only a later, May 2004 decision—which reaffirmed the findings in the December 1999 opinion following a remand by the Court of Appeals for the Ninth Circuit—provided sufficient notice of its claims to initiate litigation. Compl. ¶ 52. According to MDL, Applera and Roche "fraudulently concealed" their anticompetive conduct such that their deceptive conduct could not have been discovered earlier, and accordingly, the statute of limitations should be tolled until the actual discovery of the alleged wrongdoing.

The fraudulent concealment doctrine relieves a plaintiff from its obligation to comply with the relevant statute of limitations. Where the plaintiff:

> remains in ignorance . . . without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.

*Hobson v. Wilson*, 737 F.2d 1, 33 (D.C. Cir. 1984) (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342 (1874)). MDL insists that any reasonable attempts to discover Applera and Roche's misconduct before the PTO would have been futile since defendants' fraud was "self-concealing"—that is to say, by its very nature it prevented its discovery. *See Hobson*, 737 F.2d at 33 (distinguishing between "acts that are self-concealing (such as frauds)" and "acts where,

---

obtained, and accordingly, determined that the '818 patent was unenforceable. The decision was appealed and on March 31, 2003, the United States Court of Appeals for the Federal Circuit vacated the trial court's decision, affirmed in part, and remanded "to determine, in the exercise of its judgment, whether under all the circumstances, the incidents of inequitable conduct that we have sustained are such as to justify the sanction of rendering the '818 Patent unenforceable." *Hoffman-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1372 (Fed. Cir. 2003). On remand, the district court once again found the '818 patent unenforceable. *Hoffman-La Roche, Inc. v. Promega Corp.*, 319 F. Supp. 2d 1011, 1014–16 (N.D. Cal. 2004).

absent a subsequent act of concealment, only the perpetrator, but not the fact that a cause of

action might exist, would be unknown (such as a burglary)").[8]

     Fraudulent concealment, however, "does not come into play, whatever the lengths to

which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential

claim." *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1494 (D.C. Cir. 1989) (quoting

*Hobson*, 737 F.2d at 35).  Though the court is cognizant of the potential pitfalls in evaluating

motions to dismiss based on statute of limitations grounds, *see e.g., Richards v. Mileski*, 662

F.2d 65, 73 (D.C. Cir. 1981) ("We do not hold that the use of a motion to dismiss is always

improper to raise a statute of limitations defense, but we do suggest that a responding party

often imposes an undue burden on the trial court and impedes the orderly administration of the

lawsuit . . ."); *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 109 (D.D.C. 2002) (noting that

defendants "bear a heavy burden" when moving to dismiss based on a statute of limitations

defense), where, as here, it appears from the face of the complaint that the relevant statute of

limitations bars much of MDL's claims, the court may rule in favor of the moving party.  *See*

*Riddell,* 866 F.2d at 1494 ("If it can be determined as a matter of law . . . that plaintiff had

timely notice of the causes upon which he belatedly sues, then his showing of fraudulent

concealment will not prevent the statute of limitations from having run.").

---

[8]  The court notes that MDL argues that, even if the court were to find that Applera's and Roche's alleged fraud was not self-concealing, defendants have also engaged in affirmative acts of concealment, among them initiating "sham litigation."  Such "sham litigation" includes the patent enforcement action against Promega.  Because the court finds that MDL was on notice of its claims prior to September 2000, it need not address this distinction.

The requisite notice required to defeat a claim of fraudulent concealment is "an awareness of sufficient facts to identify . . . the particular cause of action at issue, not [notice] of just any cause of action." *Hobson*, 737 F.2d at 35.  As has been stated by MDL, "notice in the context of fraudulent concealment is close to actual notice," *In re Vitamins Antitrust Litig.*, 2000 WL 1475705, at * 5 (D.D.C. May 9, 2000), and therefore defendant must show that plaintiff was aware of more than mere "hints, suspicions, hunches or rumors." *Hobson*, 737 F.2d at 35.  Applera and Roche have met that burden.

By its own admission, MDL received notice of its claims following the publication of the May 2004 opinion in the *Promega* litigation.  Compl. ¶ 52.  The factual findings in the 2004 opinion, however, mirror those found in the court's 1999 opinion.[9]  The court sees no reason why the precise factual findings that MDL concedes provided notice of its claims in 2004, were insufficient to provide notice in 1999.  MDL suggests that, because the 1999 decision was appealed, the court is incapable of deciding whether MDL was, "on an objective basis," on reasonable notice of its claims.  The court finds this argument unpersuasive.  The

---

[9]  The 1999 Order in the *Promega* litigation made a number of specific factual findings in support of its holding that La Roche had engaged in inequitable conduct.  Among the inequitable activities attributed to La Roche were: (1) "making misleading statements regarding the relative fidelity of *Taq* as compared to the prior art enzymes"; (2) "claiming that *Taq* purified by the method taught in Example VI had a specific activity of 250,000 units/mg"; (3) "presenting Example VI as though it had been performed when, in fact, it had not been performed"; (4) "making deceptive, scientifically unwarranted comparisons between the specific activity of the claimed enzyme and the specific activity reported by Chien et al. and Kalendin et al."; (5) "claiming that *Taq* purified according to the method taught in Example VI yielded a single 88 kd band on an SDS PAGE mini-gel"; and (6) "claiming that the *Taq* produced was free from nuclease contamination."  1999 WL 1797330, at *28.  The court finds it significant that these exact findings appear verbatim in MDL's complaint.  Compl. ¶ 42.  Notwithstanding the fact that these findings were reaffirmed on remand in 2004, 319 F. Supp. 2d 1011, 1016 (N.D. Cal. 2004), there is no dispute that the findings were first published in 1999.

law does not require that a claim be proven by a preponderance of the evidence, and then affirmed on appeal, before a party is held to be on notice of a claim.

The notice that MDL received was specific and detailed. This is not an instance, such as in *In re Vitamins Antitrust Litig.*, 2000 WL 1474705, at *5, cited by MDL, where defendants urged that "market trends, such as price increases and output reductions" constituted notice of a price-fixing scheme. MDL was not required to make any inferences to discover its claim, rather, the precise fraud that forms the basis of its complaint was set forth in painstaking detail. The 1999 decision in the *Promega* litigation described the very mechanism by which Cetus executed its alleged fraud— it described the types of omissions and misrepresentations that were made to the PTO in the prosecution of the '818 patent, and by whom these statements where made.[10] Following the 1999 decision, there were no remaining pieces to the puzzle that needed to be discovered.

Nor is this a case where MDL can argue that it was unaware of the litigation. Beyond Molecular's reliance on the *Promega* litigation in its complaint, the court takes judicial notice that the *Promega* litigation, as well as the allegations of inequitable conduct, were well publicized. *See, e.g.,* Roche Ex. E (David Dickson, *Sparks Continue To Fly in* Taq *Patent Dispute*, NATURE, Feb. 2, 1995, at 377 ("The principal issue at stake remains whether the

---

[10] While MDL cites a number of cases in support of the proposition that whether a plaintiff was on notice should not be decided on a motion to dismiss, none of these cases involved the degree of notice present in the instant action. In *Firestone v. Firestone*, 76 F.3d 1205, 1210 (D.C. Cir. 1996), for example, plaintiff did not receive notice that the defendant controlled the disputed trust fund until well within the limitations period. Similarly, the plaintiff in *Riddell,* 866 F.2d at 1494, received significantly less notice where defendant argued that, because "plaintiff suspected that the price paid for his shares was too low," he should have been aware that an appraisal was not independently prepared.

thermostable enzyme extracted from *Taq* polymerase by scientists working for Cetus is identical to similar enzymes extracted from the same organism . . . which had already been described several times in the literature."); Roche Ex. K, (*DNA-Analysis Patent Owned by Roche Unit is Found to Be Invalid*, WALL. ST. J., Dec. 8, 1999, at B8 ("An important patent for DNA analysis owned by biotechnology giant Hoffman-La Roche was obtained by deliberately misleading the U.S. Patent and Trademark Office and is invalid, a federal judge ruled yesterday.")).   Moreover, because MDL is a participant in the same industry as the defendants, it is appropriate to impute knowledge of events that were widely circulated within the relevant scientific community. *See Jacobsen*, 201 F. Supp. 2d at 111 n.13 (holding that the plaintiffs' close proximity to, and interest in, the relevant information supported a finding that they were on notice of publicly available information) (citing cases).

Accordingly, the court finds that the statute of limitations began to run on December 7, 1999 and expired on December 7, 2003, nearly a year before MDL filed this action.  As a result, in the absence of a continuous violation—addressed below—MDL's complaint would be barred by the statute of limitations.

MDL insists that, even if it is prohibited from asserting claims arising from the allegedly fraudulent application for the '818 patent in 1990, under a continuous violation theory it should still be permitted to seek redress for injuries that occurred during the four years preceding the filing of its complaint on September 23, 2004.  MDL argues that each time Roche and Applera overcharged a customer, a new claim accrued.

Roche responds that the fraudulent procurement of a patent and subsequent enforcement of that patent is not a continuing violation.  Rather, by analogizing to what it

asserts is a similar case, *In re Relafen Antitrust Litig.*, 286 F. Supp. 2d 56 (D. Mass. 2003),

Roche maintains that the "act" that is the gravamen of MDL's complaint is the enforcement of

the '818 patent through the *Promega* litigation, and that any subsequent prosecution of this

litigation or further enforcement does not create an actionable claim.

      The underlying logic of *In re Relafen*, however, supports a different conclusion.

Though *In re Relafen* involved a class of drug purchasers suing a drug manufacturer for its

enforcement of a patent allegedly procured by fraud, in holding that no continuing violation

existed the court relied upon *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 239 (9th

Cir. 1987), a case "involving a plaintiff *competitor* suing a defendant for filing a sham suit."

*In re Relafen*, 286 F. Supp. 2d at 62 (emphasis added).  As the court explained, "[c]ontinuing

to litigate a sham law suit does not constitute a 'continuing violation' of the antitrust laws."

*Id.*

      The instant case, however, does not involve a plaintiff competitor, nor is the

enforcement of a patent the relevant injury.  As discussed *supra*, MDL does not allege that

Applera or Roche sought to enforce the '818 patent against MDL.  Instead, it asserts that its

injury arose through the payment of supra-competitive prices resulting from an illegitimately

obtained monopoly on *Taq*.

      That MDL is litigating this action as a purchaser, not a competitor, is a critical

distinction.  Indeed, the Second Circuit has clarified the implications of this difference in the

plaintiff's market position *vis a vis* an argument that a continuing violation has occurred:

> Although the business of a monopolist's rival may be injured at the time the
> anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the
> monopolist actually exercises its illicit power to extract an excessive price . . . .

So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide. Thus, in this setting, as in 'the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act . . . . As to those damages, the statute of limitations runs from the commission of the act.'

*Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979) (quoting *Zenith*

*Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321 (1971)).

Having found that a direct purchaser has standing to assert a *Walker Process* claim,

consistency requires a finding that the continuing violation theory entitles MDL to pursue all

claims accruing four years prior to the filing of its complaint.  Because MDL is a purchaser,

not a competitor, each time MDL was allegedly forced to pay a supra-competitive price as a

result of Roche's and Applera's anticompetitive conduct, a separate injury accrued.  *See Klehr*,

521 U.S. at 189 ("Antitrust law provides that, in the case of a 'continuing violation,' say a

price fixing conspiracy that brings about a series of unlawfully highpriced sales over a period

of years, 'each overt act that is part of the violation and injures the plaintiff,' e.g., each sale to

the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge

of the alleged illegality at much earlier times.") (quoting 2 Areeda ¶ 338b, at 145).  Therefore,

to the extent Applera and Roche move to dismiss MDL's complaint on the basis of the statute

of limitations, their motions are denied.  However, MDL will only be permitted to pursue

claims accruing after September 23, 2000, four years prior to the filing of its complaint.

## C.  Conspiracy Allegations

Applera next asserts that MDL has failed to adequately plead the existence of a

conspiracy between itself and Roche.  According to Applera, MDL's complaint fails to allege any conscious agreement to achieve an unlawful goal, and in addition, relies on only "legitimate business conduct" as evidence of any coordinated activity.

In considering Applera's contentions, the court is mindful that a complaint may not be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  Similarly, the court is cognizant of the Supreme Court's warning that, in the antitrust context, "where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."[11]  *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (quoting *Poller v. Columbia Broad.*, 368 U.S. 464, 473 (1962)).  In light of these directives, and viewing the facts in a light most favorable to MDL, as we must, the court finds that MDL has successfully stated a claim upon which relief may be granted.

With respect to Applera's assertion that MDL's complaint relies exclusively on "legitimate business conduct" as evidence of the alleged conspiracy, the court notes that "acts which are in and of themselves legal lose that character when they become constituent elements of an unlawful scheme." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962).  Demonstrating acts in furtherance of a conspiracy, however, does not

---

[11] For this reason, much of Applera's cited authority is inapposite.  Both *Northlake Mktg. & Supply, Inc. v. Glaverbel S.A.*, 861 F. Supp. 653 (N.D. Ill. 1994), and *Franzon v. Massena Mem'l Hosp.*, 89 F. Supp. 2d 270 (N.D.N.Y. 2000), are cases decided on motions for summary judgment.

obviate the need, as an initial matter, to plead that the "defendants entered into some

agreement, contract, combination, conspiracy or other concerted activity." *See Jung v. Assoc.*

*of Am. Med. Colls.*, 300 F. Supp. 2d 119, 157 (D.D.C. 2004).

Because the court draws all reasonable inferences in MDL's favor, it finds that MDL

has met this threshold requirement.  Reading the complaint as a whole, there are sufficient

allegations that, by agreement and through concerted activity, Applera and Roche sought to

monopolize the market for *Taq*.  Among the relevant statements in MDL's complaint are the

assertions that:

> In the course of their PCR partnership, Roche and Applera have, through numerous
> agreements related to the development, licensing, and use of *Taq* and other PCR
> products, patent prosecution, and enforcement of the '818 patent acted in concert
> and/or conspired with specific intent to dominate and monopolize the market for *Taq*.
> Compl. ¶ 63

> Roche and Applera have entered into and engaged in a combination and conspiracy to
> suppress competition for *Taq* and to exploit jointly the market dominance facilitated by
> the fraudulently procured '818 patent.  Defendants also entered into numerous
> agreements involving joint decisions not to compete by price and otherwise, including
> market allocation agreements.  *Id.* ¶ 67.[12]

-------------------

[12] In addition, the complaint alleges coordinated enforcement of the '818 patent.  *Id.* ¶ 37
("[R]oche, acting on behalf of itself and on behalf of Applera's predecessor PE, filed an action
against Promega Corporation . . .").  The parties vigorously contest the significance of Applera's
involvement in the *Promega* litigation.  It would be imprudent to decide this question of fact at
this juncture, and instead, the court will accept MDL's assertion as pleaded.  In addition, because
MDL has pleaded that Applera had at least some involvement in the attempt to enforce the '818
patent, the instant case is distinguishable from *Mitsubishi Electric Corp. v. IMS Tech., Inc.*, 1997
WL 630187 (N.D. Ill. Sept. 30, 1997).  In *Mitsubishi*, relied upon heavily by Applera, there were
no allegations that the licensee defendants had assisted the patentee defendant's efforts to enforce
the patent at issue, and more generally, "no suggestion of any connection between the licensees
and the conduct which violates [the antitrust laws]."  *Id.* at *5.  For the same reason Applera's
citation to *Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d
657, 678 (S.D.N.Y. 2002) (finding a "unilateral act by Cablevision" and no allegation that
codefendants had any involvement in alleged anticompetitive behavior), is also unavailing.

18

Taken together, these statements would permit a fact-finder to draw the reasonable inference that Applera and Roche knowingly coordinated their activities in an effort to dominate the *Taq* market.

Applera would demand that MDL include more specific information with respect to these allegations. This is not what the law requires at this stage of the litigation, however. Accordingly, Applera's motion to dismiss in regards to this issue is denied.

**D. Lack of Particularity in *Walker Process* Claim**

Finally, Applera moves to dismiss MDL's complaint under Fed. R. Civ. P. 9(b) ("Rule 9(b)"). Applera contends that the complaint has failed to plead with particularity Applera's knowledge of the fraud that underlies MDL's *Walker Process* claim. That is to say, Applera asserts that MDL's complaint provides insufficient detail as to whether or not Applera was aware of the alleged fraud involved in the procurement of the '818 patent.

As an initial matter, the court questions whether Rule 9(b) is applicable to the requirement—present when the defendant enforcing a disputed patent is not the original patent applicant—that the party "enforc[e] the patent with knowledge of the fraudulent manner in which it was obtained." *Walker Process*, 382 U.S. at 179. Indeed, all the cases cited by Applera involve cases where the court has dismissed plaintiff's complaint for failure to allege the fraud before the PTO with particularity, s*ee, e.g., Kash'N Gold, Ltd. v. Samhill Corp.*, 1990 WL 196089, *3 (S.D.N.Y. Nov. 29, 1990) ("The defendant here merely alleges that 'upon information and belief' the plaintiff made statements to the Patent and Trademark Office that

'upon information and belief were known to be false . . .'"), not for a lack of detail concerning knowledge of the previously perpetrated fraud.[13]

Assuming *arguendo* that an obligation to comply with Rule 9(b) exists when pleading a defendant's knowledge of the underlying fraud in a *Walker Process* claim, MDL has met the requirement.[14]  Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularly," however, "malice, intent, *knowledge*, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b) (emphasis added).  Accordingly, MDL's assertions regarding Applera's knowledge of the fraud before the PTO are sufficient.[15]

Even if the court were to adopt a more stringent standard set forth by some courts—"that circumstances must be pleaded that provide a factual foundation for otherwise conclusory allegations of scienter," *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir.

---

[13] There is no dispute that MDL has pled the alleged fraud before the PTO with sufficient particularity.

[14]   The court observes that Rule 9(b) does not place a heavy burden on plaintiffs, given that Rule 9 must be read in conjunction with the relatively liberal pleading requirements of Rule 8.  *See Shahmirzadi v. Smith Barney, Harris Upham & Co.*, 636 F. Supp. 49, 53 (D.D.C. 1985).

[15] Allegations regarding Applera's knowledge of the alleged fraud involved in the procurement of the '818 patent appear throughout the complaint, for example:

Applera and/or its predecessors have maintained agreements with Roche, and entered into new agreements with Roche, to preserve, extend, and exercise power over the *Taq* market, *despite Applera's knowledge that the '818 patent was procured by fraudulent representations and omissions to the PTO.*  Compl. ¶ 34. (emphasis added);"

[D]efendants have threatened and filed legal actions asserting infringement of the '818 patent, *despite being aware of the fraudulent conduct before the PTO that led to the procurement of the patent* and, hence, the fact that the patent was invalid.  *Id.* ¶ 37 (emphasis added).

1988), dismissal would remain unwarranted.  Because MDL has pleaded that, a number of years prior to the application for the '818 patent, PE and Cetus had entered into a joint venture to commercialize PCR products, including Cetus's DNA amplification technology, Compl. ¶ 21, it is reasonable to infer that PE, of which Applera is a predecessor, would have had knowledge of the circumstances surrounding Cetus's 1989 application for the '818 patent.

As such, Applera's motion to dismiss pursuant to Rule 9(b) is denied.

### III.  CONCLUSION

For the aforementioned reasons, it is this 1st day of December, 2005, hereby

**ORDERED** that Applera's motion to dismiss [Dkt. # 9] and Roche's motion to dismiss [Dkt. # 11] are **DENIED**.


Henry H. Kennedy, Jr.
United States District Judge